**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| EMPIRE ELECTRONICS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 13 C 376 |
| | ) |
| D&D TOOLING AND MANUFACTURING, INC., | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION

Before the court is the defendant's motion for summary judgment. For the following reasons, the court denies the defendant's motion.

### BACKGROUND

Plaintiff Empire Electronics, Inc. ("Empire") has sued defendant D&D Tooling and Manufacturing, Inc. ("D&D") for breach of contract and breach of warranty. Empire manufactures "wire harness components" for use in the automotive industry. (Def.'s L.R. 56.1 Stmt. of Undisputed Material Facts ("D&D's Stmt.") ¶ 1.) Ken Doman, Empire's CFO (see id. at ¶ 3), testified that Empire sells two product lines relevant to this case: (1) LED lighting for automobile exteriors (e.g., headlights and tail lights); and (2) "harnesses and horn plates within the steering column." (See K. Doman Dep., attached as Ex. 4 to D&D's Stmt., at 8-9.) D&D is in

the metal-stamping and metal-fabrication business. (D&D's Stmt. ¶ 6.) In February 2012, the parties agreed that D&D would: (1) build a tool to produce "heatsink" parts for Empire; (2) produce heatsink parts with that tool; and (3) produce "U-shaped" parts using a separate tool that Empire would provide to D&D.[1] (Id. at ¶ 9.) The parties memorialized their agreement in several purchase orders. (Id. at ¶ 10.)

## I. Purchase Orders EEH-37498 and 31930

On February 24, 2012, Empire submitted Purchase Order EEH037498 to D&D in connection with the heatsink portion of the transaction:

> [Item]
>
> 35305-6 TOOL
>
> [Item Description]
>
> DS Heatsink tooling and Prototypes.
>
> Tooling for RH/LH Heatsink for DS LED program. Part #'s 36035 and 36036. Tooling to remain at D&D for production. EAU = 220,000 combined. Price for production parts = $1.99 (production terms = net 60) FOB = El Paso Texas. Piece price for Heatsink to remain fixed for the life of the program. D&D agrees to support PPAP by providing 600 parts at production price no later than 4/30/2012. Terms for tooling 1/3 with PO - 1/3 with first hits - 1/3 due with PPAP.

(P.O. EEH037498, dated Feb. 24, 2012, attached as Ex. 7 to D&D's Stmt., at 1; see also D&D's Stmt. ¶ 13.) The total price for the

---

[1] Ken Doman testified that the heatsink is a component of Empire's LED-lighting product line; the U-shaped part is a component of the company's steering-column product line. (See K. Dorman Dep. at 9.)

heatsink tool was $99,000.  (D&D's Stmt. ¶ 12.)  Empire also ordered 500 heatsink "prototypes," due March 9, 2012, for an additional $5,000.  (Id.; see also P.O. EEH037498, dated Feb. 24, 2012, at 1 (250 "left hand" prototypes; and 250 "right hand" prototypes).)  Empire did not pay D&D the first $33,000 installment for the heatsink tool "with [the] PO."  (P.O. EEH037498, dated Feb. 24, 2012, at 1.)

Also on February 24, 2012, Empire submitted Purchase Order 31930 to D&D for U-shaped parts.  (See P.O. 31930, attached as Ex. 9 to D&D's Stmt.).)  Per the Purchase Order, Empire ordered U-shaped parts in batches (e.g., 5,000 units) due on particular dates in the future.  (Id.)  The first such batch was due May 28, 2012.  (Id.)  Empire's payment for the parts was due "Net 60," which the parties appear to agree means 60 days from the shipment (not invoice) date.  (See id.; D&D's Stmt. ¶ 20; Diedrick Dep., attached as Ex. 6 to D&D's Stmt., at 33 ("Q. Okay.  Did you understand that for the pieces on the U part, that there would be payment by Empire for those pieces when they were shipped Net 60?  A. Yes.").)  The court infers from the record that D&D submitted invoices in connection with part shipments, (see, e.g., Email from J. Walsh to D. Koenig, dated July 20, 2012, attached as Ex. 13 to D&D's Stmt.), but neither party has provided them.  In any event, D&D agrees that the purchase orders' terms control.  (See D&D's Stmt. ¶ 10.)

## II.  The March 9, 2012 "First Hits" Deadline

D&D began work on the heatsink tool using data that Empire provided, despite Empire's failure to pay the first installment. (See Pl.'s Stmt. of Add'l Facts ¶¶ 9-10.)[2] D&D sent prototype heatsink parts to Empire in early April 2012, after the purchase order's March 9, 2012 deadline. (See D&D's Stmt. ¶ 16.) Purchase Order EEH-37498 does not define "first hits," and the parties disagree about whether these prototypes triggered Empire's duty to pay D&D the second $33,000 installment. William Diedrick, D&D's president (see D&D's Stmt. ¶ 7), testified that "first hits" mean the "[f]irst parts that come off the die." (W. Diedrick Dep. at 77-78.) Kenneth Meissner, Empire's "new product manager" (see Meissner Dep., attached as Ex. A to D&D's Reply, at 32), agreed with Diedrick's definition. (See id. at 146 (testifying that the term means "literally the first time that tool strikes the aluminum").) Ken Doman, Empire's CFO (see D&D's Stmt. ¶ 3), testified similarly: "first hits" mean "the first set of prototypes off the tool." (K. Dorman Dep., attached as Ex. 4 to D&D's Stmt., at 81.) Empire contends that "first hits" mean the first time that

---

[2]/ D&D filed its response to the plaintiff's statement of additional facts a month after it was due. Many of its responses contain boilerplate objections without any citation to the record. (See, e.g., D&D's Resp. to Pl's Stmt. of Add'l Facts ¶ 9 ("Paragraph 9 does not contain allegations of material facts addressing Empire's material breaches of its payment obligations or D&D's motion for summary judgment. D&D admits only that the parties were in communications on the dates referenced and denies all remaining allegations in paragraph 9 as they paraphrase and mischaracterize the parties' communications.").) Those responses do not comply with the local rule, and the court will deem D&D to have admitted the statements corresponding to D&D's deficient responses. See N. Dist. of Ill. L.R. 56.1(a) & (b)(3).

the tool produces "functional" parts. (See Pl.'s Stmt. of Add'l Facts ¶ 2.) George Doman, Empire's "purchasing engineer," (see D&D's Stmt. ¶ 4), offered the following circular definition:

> Q. And a first hit is that point in time where the — where the tool hits the material and begins to create a product, correct?
>
> A. Possibly. It mean, if it produces something that's nowhere near functional, there could be —
>
> Q. Okay.
>
> A. — a misunderstanding there.
>
> Q. So your definition of a first hit would be when the tool first makes a product that is functional?
>
> A. Not necessarily.
>
> Q. Well, what is your understanding of what a first hit is?
>
> A. It would be when you get some representative parts off of that tool.
>
> Q. And what is a representative part?
>
> A. Something that represents a functional part, something that is functional.

(G. Doman Dep., attached as Ex. 5 to D&D's Stmt., at 19-20.) Edward Doman, Empire's president (see D&D's Stmt. ¶ 2), elaborated on George Doman's testimony:

> Q. What's your understanding of what first hits is?
>
> A. Again, well, yeah, he [George Doman] said something — if I remember correctly, he said something about functioning parts; so I guess if that's what he said, then I would more or less agree with, you know, a functioning part. If somebody hits a part, to take it to the extreme, and, you know, it's not even in the shape of it — or you know, there's nothing I can do with it, is

that a hit or are they just trying to run some material through and get paid, right? In this case, it was arguable, given the fact that we couldn't use a good portion of them, whether, you know, those were just being jammed through a tool that was not really a good tool. So, you know, it's something that's — in this business, it's something that has been interpreted a few different ways in terms of hits. You're paying two-thirds. There's an assumption that it's going to be pretty close to being a good tool and good parts.

Q. But you agree with George Doman's statement that first hits mean at least when the tool is producing acceptable parts?

A. More or less I do.

(E. Doman Dep., attached as Ex. 3 to D&D's Stmt., at 25-26.) Empire contends that D&D "never" produced functional heatsink parts. (Empire's Stmt. of Add'l Facts ¶ 2.)

Whether or not the heatsink prototypes constituted "first hits," it is undisputed that they did not conform to Empire's specifications. On April 11, 2012, Ken Meissner notified D&D that the parts had "boss heights" below the "design requirements." (See Email from K. Meissner to B. Diedrick, dated Apr. 11, 2012, attached as Ex. 9 to Empire's Stmt. of Add'l Facts.) On April 27, 2012, Empire notified D&D that some of the parts from another shipment "present[ed] warpage," and that others had "boss heights" below Empire's requirements. (See Empire's Stmt. of Add'l Facts ¶ 16.) D&D responded that it needed more information from Empire to correct these issues:

> We can put out an alert to check for the condition that you are referring to, but we will need the drawings (which are currently being completed for release by your

> company) in order to control this. We will work to overcome this condition if in fact it is the tool, but very hard to take blame for something that is not controlled on a drawing. Currently we do not have a released drawing in our system in order to check this defect against.

(Email from S. Harris to J. Pineda Zelaya, dated Apr. 27, 2012, attached as Ex. 12 to Empire's Stmt. of Add'l Facts.) Empire acknowledged that it had not yet produced a "revised drawing," but maintained that D&D already had sufficient information to produce parts without the defects that Empire had identified. (See Empire's Stmt. of Add'l Facts ¶ 16; see also Email from K. Meissner to S. Harris, dated Apr. 27, 2012, attached as Ex. 13 to Empire's Stmt. of Add'l Facts ("You have a drawing that you quoted to; see attached. I am working on a revised drawing; you are awaiting the revised drawing. The parts you ship should all meet the general tolerance called out at a minimum.").)

## II. The April 30, 2012 "PPAP" Deadline

D&D did not produce a "PPAP"-compliant heatsink part before the Purchase Order's April 30, 2012 deadline. Neither party defines "PPAP" in its statement of facts. Empire alleged in its complaint that the acronym stands for "Production Part Approval Process." (See Compl. ¶ 7.) The court gathers from the record that PPAP refers to the end customer's approval of a part as meeting its specifications. (See G. Doman Dep. at 20 ("Q. And you understand that PPAP is that point in time in a program where the customer approves the product as meeting its specifications, fair?

A. Fair.").) In order to "achieve PPAP," D&D needed Empire to provide the data necessary to produce parts conforming to Empire's customer's specifications. (D&D's Stmt. ¶ 17.) The parties dispute whether D&D received that information from Empire before the April 30 deadline. Empire contends that D&D had the essential specifications from the project's inception. Steve DeMascio, who is responsible for D&D's marketing, testified that the information that the company received from Empire in February 2012 was sufficient to "build the tool to specifications as requested by Empire and its customer[.]" (DeMascio Dep., attached as Ex. 39 to Empire's Stmt. of Add'l Facts, at 71; see also Empire's Stmt. of Add'l Facts ¶ 10.) Steve Harris, D&D's engineering manager (see S. Harris Dep., attached as Ex. 36 to Empire's Stmt. of Add'l Facts, at 14), conceded that at least one specification in the original materials — "extrusion height" — remained unchanged throughout the entire project. (See id. at 213 (testifying that the "extrusion height" specification did not depend on D&D receiving a final part drawing).) D&D contends that it missed the April 30 deadline because Empire did not give it a final "drawing" or "print" before that date. (See Email from S. Harris to J. Pineda Zelaya, dated Apr. 27, 2012 ("Currently we do not have a released drawing in our system in order to check this defect against."); Diedrick Dep. at 63 (testifying that D&D could not produce a PPAP-compliant part before it received a "release for production part print."); see also D&D's Stmt. ¶ 18.) In any event, D&D continued to work on the

tool in an attempt to correct the defects that Empire identified. (See Email from S. Harris to J. Pineda Zelaya, dated Apr. 27, 2012, attached as Ex. 12 to Empire's Stmt. of Add'l Facts.) Meanwhile, on May 21, 2012, Empire made the first $33,000 payment to D&D for the heatsink tool. (Pl.' Stmt. of Add'l Facts ¶ 1.) Neither party has attempted to explain why Empire paid D&D at that particular time, and not in February when the payment was due.

**III. U-Shaped Parts Production**

The summary-judgment record is undeveloped regarding D&D's U-shaped part production. D&D effectively admits that it did not produce U-shaped parts on schedule, (see Empire's Stmt. of Add'l Facts ¶ 8), but the record is short on details. On July 20, 2012, D&D emailed Empire a list of outstanding invoices and demanded that Empire pay $91,153.19 for "all items over 30 days." (See Email from J. Walsh to D. Koenig, dated July 20, 2012, attached as Ex. 13 to D&D's Stmt.) It is difficult to determine, without more context, whether the figures in D&D's email were accurate.[3] D&D contends that "Empire directed that all past due payments be stopped on July 24, 2012." (D&D's Stmt. ¶ 25.) It has not, however, supported that statement with admissible evidence. (See Email from B. Diedrick to J. Doman, dated July 24, 2012, attached as Ex. 14 to D&D's Stmt., at 1 (email from a D&D employee to

---

[3] D&D's demand was inflated in at least one respect. Empire had already paid the first $33,000 installment by that time, and it is undisputed that D&D never produced a PPAP-compliant part. So, it was entitled to $33,000 for the heatsink tool, at most. (Cf. Email from J. Walsh to D. Koenig, dated July 20, 2012, at 1 (demanding $66,000 in connection with P.O. EEH037498).)

Diedrick stating that someone named "Donna" told her that "all payments are on hold");[4] E. Doman Dep. at 148 (testifying that he did not know whether the just-cited email was "an accurate reflection of what was happening with respect to payables to D&D at that point").)

**IV. Continued Problems with the Heatsink Tool**

Empire submitted a "released for production" drawing on July 27, 2012. (See Empire's Stmt. of Add'l Facts ¶ 21.) Nevertheless, D&D continued to make adjustments to the heat-sink tool in August and September 2012. (See Empire's Stmt. of Add'l Facts ¶¶ 22-25.) Steve Harris notified Empire on September 24, 2012 that D&D was "making what I think will be the final adjustment to bring the parts in (location of extrusion to hole and edge registration). I will advise as soon as we have completed the adjustment and have acceptable parts this week." (Empire's Stmt. of Add'l Facts ¶ 25.) It appears that D&D still had not finalized the tool three weeks later. (See Email from B. Diedrick to E. Doman, dated Oct. 18, 2012, attached as Ex. 24 to Empire's Stmt. of Add'l Facts ("We have made adjustments as changes have been given to us and is [sic] my understanding we were within one extrusion, (now adjusted), of having a flawless production part.").)

---

[4] The court infers from the email that "Donna" is an Empire employee, which suggests that her statement might fall within the hearsay exclusion for opposing-party statements. See Fed. R. Evid. 801(2). As the statement's proponent, however, D&D has the burden to show that the exclusion applies. It has not attempted to do so.

**V.   Empire's Late Payments for U-Shaped Parts & Termination**

D&D continued to supply U-shaped parts to Empire through at least September 25, 2012.  (See "Blanket PO Release Form," dated October 22, 2012, attached as Ex. 11 to D&D's Stmt., at 1 (indicating that Empire had received 87,738 U-shaped parts as of that date, and that it had last received a shipment from D&D on September 25, 2012.).)  Communications between the parties broke down in October 2012.  (See Email from W. Diedrick to E. Doman, dated Oct. 18, 2012, attached as Ex. 24 to D&D's Stmt. (explaining that he had not responded to Ed Doman's correspondence because he thought took it "to mean that you no longer were interested in doing business with D&D Manufacturing and as such not really expecting a response.").)  On or about November 15, 2012, Empire entered into an agreement with Ramcel Engineering Company to purchase a heatsink tool, heatsink parts, a U-shaped-part tool, and U-shaped parts.  (See Letters of Intent, dated Nov. 15, 2012, attached as group Ex. 27 to Empire's Stmt. of Add'l Facts).)  It appears that Empire issued Purchase Order 32183 for additional U-shaped parts on November 28, 2012.[5] (See D&D's Stmt. ¶ 19.)  Just two days later, Empire paid D&D $130,000 "without prejudice and without reservation to Empire's rights to pursue its legal remedies in connection with this payment, which Empire contends was made

---

[5]/  This date is puzzling.  Four months earlier, D&D sent an email to Empire that appears to demand payment on invoices for parts shipped in connection with Purchase Order 32183. (See Email from J. Walsh to D. Koenig, dated July 20, 2012, attached as Ex. 13 to D&D's Stmt.).)

under condition of economic distress." (Letter from R. Rassel to B. Diedrick, dated Nov. 30, 2012, attached as Ex. 31 to Empire's Stmt. of Add'l Facts.) This letter terminated Empire's outstanding purchase orders and ended the parties' business relationship. (See id. ("Empire is terminating any and all outstanding Purchase Orders related to Heat Sink and/or U Shape Plate Parts connected with Empire's assembly process based on D&D['s] non-performance of its obligations.").)

## **DISCUSSION**

D&D argues that it is entitled to summary judgment on Empire's claims because Empire materially breached the purchase orders before D&D's performance was due.

**I. Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must construe "all facts and reasonable inferences in the light most favorable to the nonmoving party." See Empress Casino Joliet Corp. v. Johnston, 763 F.3d 723, 728 (7th Cir. 2014). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." Nichols v. Michigan City Plant Planning Dept., 755 F.3d 594, 599 (7th Cir. 2014) (citation and internal quotation marks omitted).

**II. Whether Empire's Prior Material Breach Excused D&D's Performance**

The parties essentially agree that the Uniform Commercial Code ("UCC") governs Empire's purchase orders. (See Empire's Resp. at 5-8; D&D's Reply at 3.) They devote most of their briefing, however, to two common law principles: the "first breach" and "partial breach" doctrines. These principles appear consistent with the UCC's rules — the parties have not argued otherwise — and thus apply in this case. See 810 ILCS 5/1-103(b) ("Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity . . . supplement its provisions.").

**A. Purchase Order EEH-37498 (The Heatsink Tool & Parts)**

Empire admits that it materially breached its agreement with D&D by paying the first $33,000 installment for the heatsink tool four months after it was due. (See Empire's Resp. to D&D's Stmt. ¶ 22 (admitting that timely payment was a material term).) "[A] party to a contract who commits the first breach of its terms cannot maintain an action for a subsequent breach by the other party." Daniggelis v. Pivan, 513 N.E.2d 92, 96 (Ill. Ct. App. 1987) (citation and internal quotation marks omitted); see also U.S. Fid. & Guar. Co. v. Old Orchard Ltd., 284 Ill. App. 3d 765 (1st Dist. 1996) (A "party to a contract is discharged from his duty to perform where there is a material breach of the contract by the other party.") (citation an internal quotation marks omitted).

The record is less clear about when, or whether, D&D achieved "first hits." As it applies to D&D's motion, however, the issue is academic. Empire's failure to make the first payment to D&D on time is sufficient to allow D&D to invoke the "first breach" principle.

Empire argues that it can still pursue a claim for damages against D&D because D&D did not "cancel" the contract after Empire's material breach. The parties discuss <u>Cities Serv. Helex, Inc. v. U.S.</u>, 543 F.2d 1306 (Ct. Cl. 1976) at length. The court relies instead on <u>Emerald Investments Ltd. Partnership v. Allmerica Financial Life Ins. and Annuity Co.</u>, 516 F.3d 612, 618 (7th Cir. 2008), a more recent Seventh Circuit case applying Illinois law. The plaintiff in that case, Emerald Investments, L.P. ("Emerald"), engaged in "international time zone arbitrage." <u>Id.</u> at 615. In connection with that practice, Emerald transferred large sums of money between a money-market account maintained by the defendant, Allmerica Financial Life Insurance and Annuity Co. ("Allmerica"), and an affiliated mutual fund. <u>Id.</u> Emerald's arbitrage imposed costs on Allmerica's other clients, and it stopped the practice by limiting the number of transfers that customers could make from the mutual fund to another account. <u>Id.</u> Three years later, after Emerald sued Allmerica for breach of contract, Allmerica employed an alternative method to stop market-timing arbitrage: it closed its international mutual funds to new investments. <u>Id.</u> The

district court held that Allmerica's first effort to stop Emerald's arbitrage breached the parties' contract, but that the second did not.  Id.  Thus, the court awarded Emerald damages through the date that Allmerica closed the mutual funds.  Id. at 618 (noting that the district court's ruling "truncated [Allmerica's] liability at July 2004").  Both parties appealed the district court's damages award.  Most relevant to this case, Emerald argued that Allmerica could not exercise its contractual right to close the mutual funds to new investments after it had materially breached the contract by limiting transfers.  Id. at 618.  Allmerica responded by invoking the "partial breach" doctrine:

> [Emerald argues] that Allmerica, having broken the contract with it in December 2001, could not later invoke the contractual provision entitling it to close its accounts to new money, which truncated its liability at July 2004.  In defense, Allmerica invokes the doctrine of "partial breach." Like many legal doctrines, it is badly named.  There is no such thing as a partial breach. There is a breach of contract, and there are alterations and terminations that are not breaches. The doctrine is really an aspect of election of remedies. If a party to a contract breaks it, the other party can abandon the contract (unless the breach is very minor, Circle Security Agency, Inc. v. Ross, 107 Ill.App.3d 195, 63 Ill.Dec. 18, 437 N.E.2d 667, 672 (1982); Sahadi v. Continental Illinois National Bank & Trust Co., 706 F.2d 193, 196-97 (7th Cir. 1983) (Illinois law)) and sue for damages, or it can continue with the contract and sue for damages. William W. Bierce, Ltd. v. Hutchins, 205 U.S. 340, 346, 27 S.Ct. 524, 51 L.Ed. 828 (1907) (Holmes, J.); South Beloit Electric Co. v. Lar Gar Enterprises, Inc., 80 Ill.App.2d 367, 224 N.E.2d 306, 310-11 (1967). But if it makes the latter election, it is bound to the obligations that the contract imposes on it. Wollenberger v. Hoover, 346 Ill. 511, 179 N.E. 42, 57 (Ill.1931); Newton v. Aitken, 260 Ill.App.3d 717, 198 Ill.Dec. 751, 633 N.E.2d 213, 216-17 (1994); Continental Sand & Gravel,

Inc. v. K & K Sand & Gravel, Inc., 755 F.2d 87, 93 (7th
Cir. 1985) (Illinois law). When Allmerica in December
2001 broke its contract with Emerald by refusing to
permit it more than one transfer a month, Emerald could
have terminated the contract. But it did not, and so
Allmerica was entitled to enforce the obligations that
the contract put on Emerald.

Id.; see also Cities Serv. Helex, 543 F.2d at 1313 (similar); 14 Williston on Contracts § 43:15 (4th ed.) (recognizing the partial-breach doctrine as an exception to the general rule that a material breach discharges the non-breaching party's duty to perform). In this case, D&D could have terminated the contract when Empire did not pay the first $33,000 installment when it was due in February 2012. See 810 ILCS 5/2-703(f) (the seller may "cancel" the contract if the buyer "fails to make a payment due on or before delivery"). It did not do so, and continued to perform under the contract for another nine months. Applying the rule stated in Emerald, Empire is entitled to enforce the provision of the Purchase Order requiring D&D to produce PPAP-compliant parts before April 30, 2012.[6]

D&D argues that the partial-breach doctrine is inapplicable because D&D is not seeking damages for late payment:

> Empire's response doesn't fit the circumstances of this
> case. If D&D was suing Empire for breach of contract,
> then perhaps Empire could argue that D&D's failure to
> "cancel" the contract waived its breach of contract
> claim. But D&D is not the aggressor here — Empire is.

---

[6] Whether Empire caused D&D to miss the deadline, as D&D has argued, is not before the court.

> And Empire is — without question — the initially breaching party.

(D&D's Reply at 2-3.) D&D misconstrues the partial-breach doctrine. A party does not waive its claim for breach of contract by failing to terminate the contract after the other party's material breach. See Emerald, 516 F.3d at 618 (the non-breaching party may elect to "continue with the contract *and* sue for damages") (emphasis added). Rather, it loses the right to abandon its own contractual obligations. See id. (if the non-breaching party elects to continue the contract, "it is bound to the obligations that the contract imposes on it"). The fact that D&D has not filed a counterclaim for damages is irrelevant. The court denies D&D's motion for summary judgment with respect to Empire's claim that D&D breached Purchase Order EEH-37498.

### B. Purchase Order 31930 (U-Shaped Parts)

Even assuming that D&D accurately stated that Empire was in default in July 20, 2012, it continued to ship parts to Empire through at least September 25, 2012. Thus, the partial-breach doctrine also applies to Empire's claim for damages for untimely and defective U-shaped parts. D&D argued for the first time in its reply brief that Empire has not cited evidence supporting its claim that the parts were, in fact, defective. (See D&D's Reply at 11.) D&D waived this argument. See Rives v. Whiteside School Dist. No. 115, 575 Fed. Appx. 678, 680 (7th Cir. 2014) (litigants waive arguments they raise for the first time in a reply brief). Its

motion is based upon its argument that Empire breached the contract first, barring its claim for damages. This theory did not require Empire to cite evidence that D&D's U-shaped parts failed at an unacceptable rate. See Costello v. Grundon, 651 F.3d 614, 629 (7th Cir. 2011) (the non-moving party is not required to present evidence on issues that the moving party did not raise); see also Sublett v. John Wiley & Sons, Inc., 463 F.3d 731, 736 (7th Cir. 2006) ("[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision.").

### C. Empire's Breach-of-Warranty Claims

D&D argues that "[b]ecause Empire cannot assert a claim based on breach of contract, its claim based upon breach of warranty [must] also fail." (See D&D's Mem. at 9.) The court has held otherwise, and D&D has not asserted any independent basis for awarding summary judgment on Empire's breach-of-warranty claims. Thus, the court also denies D&D's motion as to those claims.

**CONCLUSION**

The court denies D&D's motion for summary judgment. The court sets a status hearing for November 19, 2014 at 8:45 a.m. before the Honorable Amy St. Eve in courtroom 1241.

DATE: November 10, 2014

ENTER: _____
Amy St. Eve, United States District Judge